**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 99-1250-CIV-MORENO

CHARLES McCORVEY and SCHENELL
MCCORVEY,

        Plaintiffs,

vs.

BAXTER HEALTHCARE CORPORATION, C.R.
BARD, INC.,

        Defendants.

_____/

FILED by _____ D.C.

SEP 3 0 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S. D. OF FLA.

## ORDER GRANTING DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY AND ORDER GRANTING SUMMARY JUDGMENT

THIS CAUSE came before the Court upon Defendant C.R. Bard's Motion to Exclude Expert Testimony (**D.E. 102**) filed on **July 20, 2001**, Defendant C.R. Bard's Motion for Summary Judgment (**D.E. No. 57**), filed on **January 24, 2001**.

THE COURT has considered the motions, responses and the pertinent portions of the record, and is otherwise fully advised in the premises. Because the Court finds that Plaintiff's expert testimony should be excluded, the Court grants summary judgment. Plaintiff is without proof to make a prima facie case for strict liability.

### LEGAL STANDARD

Summary judgment is authorized where there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements of its case on

which it will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The nonmovant must

present more than a scintilla of evidence in support of the nonmovant's position.  A jury must be able

reasonably to find for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).

## FACTUAL BACKGROUND

Plaintiff, Charles McCorvey, brought this strict liability claim alleging he was injured by a

defective foley catheter, a medical device used to remove bodily fluids from the human bladder.

Defendant, C.R. Bard, Inc. is a manufacturer of foley catheters and is allegedly the manufacturer of

the defective catheter at issue in this case.[1]  Defendant Baxter Health Care Corp. is a foley catheter

distributor and Plaintiff alleges that Baxter sold the defective catheter to Baptist Hospital. At Baptist

Hospital, Dr. Keith Russell used the foley catheter post-operatively on Plaintiff.  In support of its

strict liability claim, Plaintiff submits the testimony of Dr. Lee Swanger, a mechanical engineer and

materials expert, Dr. Keith Russell, the doctor who used the catheter at issue, and Dr. Craig Herman,

a doctor familiar with foley catheters generally.

On February 7, 1995, Plaintiff underwent a procedure conducted by his treating urologist,

Dr. Keith Russell, at Baptist Hospital in Miami, Florida.  After the procedure, two 30 cc foley

catheters were utilized on Plaintiff.   Dr. Russell inserted the first foley catheter after filling the

catheter with saline to 50 cc's, contrary to the manufacturer's indications, which warn that the device

---

[1]Plaintiff Schenell McCorvey's claim for loss of consortium stems from her husband's products liability claim. Under Florida law a loss of consortium claim is a derivative right and she may recover only if her husband has a cause of action against the same defendant. *See Gates v. Foley*, 247 So. 2d 40 (Fla. 1971). Because this Court is granting summary judgment due to Plaintiff Charles McCorvey's failure to make a prima facie case of strict liability, it must also dismiss Plaintiff Schenell McCorvey's claim for loss of consortium.

should not be filled to more than 35 cc's of sterile water. Dr. Russell stated that after inserting the catheter into Plaintiff's body, he reinflated it so that the inflation was such to hold the device within the bladder. The device functioned properly for six hours when a nurse in the treatment room noted that the catheter's balloon had broken. The balloon section of the catheter is that part of the catheter that is inflated to hold the catheter in place in the bladder. The balloon deflated and the catheter fragmented. The hospital physician then removed this catheter from patient and inserted another one to complete the purpose.

Several months after this incident, Plaintiff noticed recurring symptoms of frequent urinary outflows and urgency. He also experienced irritative lower bladder symptoms. Plaintiff underwent a cystoscopy to ascertain the cause of the symptoms. During the cystoscopy, Dr. Russell determined that there was an obstruction, possibly a stone, which he could not remove. He performed a repeat cystoscopy on October 29, 1996, and removed a material that was lodged in Plaintiff's prostate gland. The pathology department at Baptist Hospital determined that the material was a catheter fragment. This fragment is now missing. Following this procedure, Dr. Russell inserted another foley catheter in Plaintiff, which he inflated to 30 cc's prior to insertion.

Defendant C.R. Bard argues in its motion for summary judgment that Plaintiff fails to make its prima facie case for strict liability. Plaintiff proffers the testimony of Dr. Lee Swanger, to prove that the catheter had a design defect that caused Plaintiff's injuries. Defendant has moved to exclude Dr. Swanger's testimony, asserting that because Dr. Swanger fails to base his opinions on methods and procedures of science, his opinions are irrelevant. If Dr. Swanger's testimony is excluded, summary judgment is appropriate as there is insufficient evidence on the record to make a prima facie case for strict liability.

Defendant Baxter Healthcare Corporation argues that if the Court enters  final summary judgment in favor of C.R. Bard, summary judgment in favor of Baxter is also appropriate, as the distributor of the foley catheter at issue in this case.

## LEGAL ANALYSIS

### A. Expert Testimony: Rule 702 and the *Daubert* Analysis

C.R. Bard seeks to exclude Dr. Swanger's testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  Defendant claims Dr. Swanger is not qualified to give either a general or specific causation opinion in this case and that his causation opinion: (1) is not grounded in the methods and procedures of science, (2) is not relevant, and (3) is sheer speculation based on an inadequate factual basis.  Plaintiff, as the proponent of this testimony, bears the burden of establishing the admissibility of the proffered expert testimony.  Fed. R. Evid. 104; Fed. R. Evid. 702.

Fed. R. Evid. 702 governs the admissibility of expert evidence.  The rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The rule lays out the criteria that the Supreme Court explained in *Daubert*.

The Supreme Court in *Daubert* addressed the critical factors upon which district courts base decisions of expert testimony admissibility.  *Daubert* requires district courts to assume a gatekeeping

4

function to ensure the reliability and relevancy of expert testimony. That is to make certain that an expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The Supreme Court has instructed lower federal courts to employ *Daubert*'s analysis when determining the admissibility of all expert testimony. *See id.*, 526 U.S. at 150.

The *Daubert* Court established a two-pronged analysis that requires a district court to determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. The Eleventh Circuit has held that for expert testimony to be admissible under Rule 702, the proponent of the testimony must show that: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact. . .." *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001); *see City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548 (11th Cir. 1998). To be admissible the proponent must meet all three criteria set forth by the Eleventh Circuit. *See id.*

In determining whether expert testimony is reliable, a court should assess whether the reasoning or methodology underlying the expert's theory is based on valid scientific methods and procedures without deciding upon the correctness of the expert's conclusions. *See Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1162 (S.D. Fla. 1996), *aff'd*, 158 F.3d 588 (11th Cir. 1998). The *Daubert* Court provided several factors to guide federal courts in evaluating whether the particular scientific testimony is reliable. Such factors include: (1) whether the expert's theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) whether the particular

5

scientific technique has a known or potential rate of error, and whether standards exist to control the technique's operation; and (4) whether the technique is generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94. The *Daubert* reliability factors are neither exhaustive nor applicable in every case. *See Haggerty*, 950 F. Supp. at 1162. Other courts have found other factors relevant in determining whether expert testimony is sufficiently "reliable" to be considered by the trier of fact.  These factors include:

> (1) Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*).

> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

> (3) Whether the expert has adequately accounted for obvious alternative explanations. *See Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994). . ..

Fed. R. Evid. 702 advisory committee's note.

After conducting a reliability analysis, the Court must then determine whether the expert opinion is relevant so that it "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591.  To determine relevance, Rule 702 requires a trial court to find a valid scientific connection to the pertinent inquiry as a precondition to admissibility. *Daubert*, 509 U.S. at 591-92.  That connection exists when the expert testimony proffered is sufficiently tied to the facts of the case so that it will aid the jury in resolving the factual dispute.  *See id.*

In applying this analysis to determine the admissibility of Dr. Swanger's testimony, this

6

Court must first apply *Daubert*'s reliability analysis focusing on the methodology Dr. Swanger employed in reaching his opinion and not the substance of the opinion itself. *Daubert*, 509 U.S. at 595.[2]

### 1. The Reliability Prong and Dr. Swanger's Methodology

Defendant C.R. Bard argues that Dr. Swanger is not qualified to give the expert opinions he seeks to give in this case. Dr. Swanger is a consultant that works for Exponent Failure Analysis Associates, in Miami, Florida and is an adjunct professor at the University of Miami School of Engineering. Dr. Swanger has been a mechanical engineer since 1972. He teaches an introductory course in materials and another course in the deformation and fracture of materials. In the materials course, Dr. Swanger focuses students on the study of metal, ceramics, and polymers. Dr. Swanger claims that the foley catheter's components fall under the polymer category, but, he has never worked with foley catheters nor has he conducted extensive research on their construction. Moreover, Dr. Swanger has never attended any courses or seminars relating to catheter use or construction. He has never authored any technical papers or studies relating to catheters or any products involving latex rubber. Dr. Swanger's general expertise in mechanical engineering does not necessarily translate into expertise in specialized products. *See Acosta-Mestre v. Hilton Int'l*, 156 F.3d 49, 53 (1st Cir. 1998)

---

[2]Because this case presented a fully developed record and the expert's deposition and affidavit were available to the Court, the Court, in the interests of judicial economy, exercised its discretion not to hold a *Daubert* hearing. *Daubert* hearings are not mandatory. *See City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548 (11th Cir. 1998) (concluding that while complicated cases involving multiple experts may be well-served by holding a *Daubert* hearing, such hearings are not required by law or the rules of procedure); *Target Mkt. Publ'g, Inc. v. Advo, Inc.*, 136 F.3d 1139, 1142 n.3 (7th Cir. 1998) ("the Supreme Court did not suggest in either *Daubert* or *General Electric* that district courts would be required to conduct in limine hearings").

(holding mechanical engineer unqualified to opine on chair's defective design); *Taylor v. Cooper Tire & Rubber Co.*, 130 F.3d 1395, 1397 (10th Cir. 1997) (holding expert qualified in materials failure not qualified to testify on tire failure).  Assuming, however, that Dr. Swanger possessed the qualifications necessary to give an opinion, that opinion is only admissible if Dr. Swanger employed proper scientific methodologies.

To reach a conclusion Dr. Swanger testified that he researched some patent information on foley catheters and conducted one modified ASTM test on one catheter like the one at issue in this case.  The ASTM protocol sets forth the standard relating to laboratory performance of catheters.  The protocol ASTM test is used to determine whether the foley catheter will perform at the appropriate levels.  For a 30 cc catheter, the size of the catheter at issue in this case, the test calls for filling the catheter to 30 cc's and hanging a one-pound weight from it.  Dr. Swanger filled this device progressively from 10 cc's to 50 cc's and he hung a one-pound weight.  When the catheter did not fragment, he modified the ASTM test and increased the volume to 50 cc's and he hung a five-pound weight on it for 43 hours.  When the catheter did not fragment, he again increased the volume to 100 cc's and then to 120 cc's for 209 hours.  Dr. Swanger finally filled the catheter to 330 cc's, which induced a failure in the product within the main body of the catheter not the balloon area.  The balloon was the part that fragmented when the foley catheter was used on Plaintiff. Dr. Swanger was unable to examine the foley catheter that fragmented in this case because it was lost or discarded.  He did examine some photographs of the catheter fragment but by his own admission, these photographs did not allow him to determine the cause of the failure.

From conducting this test on one foley catheter, Dr. Swanger opines that the foley catheter failed at the proximal attachment-- that is where the balloon portion of the device is connected to the

main body.  Dr. Swanger then states that C.R. Bard's foley catheter contains a design and manufacturing defect.  He claims that C.R. Bard's method of sealing the balloon sleeve ends by dipping in latex rubber creates a thin connection between the edge of the sleeve and the catheter tube. He further states that the thickness of this connection can vary during the dipping process making it vulnerable to mechanical failure.  He opines that this occured in the catheter used on Plaintiff.

Dr. Swanger has not performed any tests to determine how a thicker layer of latex would perform.  He did not review C.R. Bard's manufacturing specifications  for the latex dipping and yet, he criticizes those specifications as not providing a thick enough connection or a connection that has a variable thickness.  Dr. Swanger did not review any of C.R. Bard's competitors specifications for the thickness of the latex.  He has not tested any foley catheters to determine what the minimum thickness of the latex should be to show why C.R. Bard's foley catheters are deficient.  He has neither tested nor researched the effect of a thicker latex connection. Nor has he researched whether a thicker connection would be a feasible design for this product.  Moreover, he has never tested any alternative design to the C.R. Bard foley catheter.

In forming his opinion, Dr. Swanger only relied on some photographs, some patent information, and the one catheter that he examined.  Dr. Swanger did not perform any other independent research of medical or technical literature regarding catheters.  He did not speak to any physicians or nurses on the proper use of a foley catheter. His own test does not support a flaw in the connection.  At most, his modified ASTM test rules out the possibility that overinflation caused the catheter to fail since he was able to fill the catheter to a greater volume than was present in this case (i.e. 330 cc's compared to 50 cc's) before inducing a failure.  Dr. Swanger does not consider or test other possibilities for failure that could have come from sources outside the product, such as

the effect of improper storage conditions or the effect of contaminated lubricants on the foley

catheter's performance. Instead, Dr. Swanger states that because the catheter failed, there necessarily

must have been a defect in the product's design.

### a. Applying *Daubert*'s Reliability Factors

The Court must assess the reliability of Dr. Swanger's testimony under the *Daubert* factors.

Of paramount consideration is whether Dr. Swanger utilized proper scientific method in reaching

his conclusions. "Scientific methodology today is based on generating hypotheses and testing them

to see if they can be falsified." *Daubert*, 509 U.S. at 593.

The first of *Daubert*'s reliability factors is whether the expert's theory has been tested. In this

case, Dr. Swanger's ultimate conclusion is that C.R. Bard's latex dipping process is defective and this

design defect caused the latex connection between the balloon portion of the catheter and its main

component to be too thin leading it to fragment in Plaintiff. This causation opinion could be tested,

however, Dr. Swanger has not conducted any tests that verify his hypothesis. The modified ASTM

test he conducted caused a failure in the main component of the catheter and not in the allegedly

defected connection. Moreover, Dr. Swanger did not conduct sufficient background research. He

merely reviewed some patent information and the ASTM protocol. He did not review C.R. Bard's

manufacturing specifications or quality control procedures, nor did he read any medical or

bioengineering literature regarding proper catheter use and construction. Dr. Swanger's causation

opinion is speculative, and not the tested hypothesis envisioned under Rule 702 and *Daubert*. A

district court properly excludes expert testimony where the expert has conducted no independent

research and the causation opinion rendered is only a "hypothesis which [the expert] ha[s] yet to

attempt to verify or disprove by subjecting it to the rigors of scientific testing." *Haggerty*, 950 F.

10

Supp. at 1164 (citing *In re Paoli R.R. Yard PCB Litigation* 35 F.3d 717, 764 (3rd Cir. 1994)).

The second of *Daubert*'s reliability factors is whether the expert's theory has been subject to peer review and publication. Dr. Swanger's methodology has not been subject to scientific scrutiny through peer review. The record is devoid of any evidence that indicates that Dr. Swanger published this causation opinion or gave any public speeches on it. At most, Dr. Swanger discussed his theory with one colleague Dr. Whitley.  Plaintiff has not filed Dr. Whitley's affidavit to buttress Dr. Swanger's opinion. Although peer review is not a dispositive factor, it does "increase the likelihood that substantial flaws in methodology will be detected." *Daubert*, 509 U.S. at 593.

The third *Daubert* factor is whether the particular scientific technique has a known or potential rate of error and whether a standard exists to control the technique's operation.  Dr. Swanger did not perform any test to determine the validity of his hypothesis that C.R. Bard's latex dipping process was inadequate. This Court, therefore, cannot ascertain what the rate of error on that test would be.  The modified ASTM test that Dr. Swanger conducted did not test his causation hypothesis.  Even if it did, this Court would not know and indeed, Dr. Swanger could not properly ascertain what the error rate would be because he only performed one test on one catheter.

The fourth *Daubert* factor is whether the technique is generally accepted in the scientific community. There is no evidence to indicate that the method Dr. Swanger followed is generally accepted in the scientific community.  While Dr. Swanger may have properly created a hypothesis about what occurred, there is no evidence to indicate that his causation conclusion would be generally accepted in the scientific community. There is no evidence that Dr. Swanger followed any scientists in the field that used this scientific methodology.

The *Daubert* factors are non-exhaustive and this Court may properly consider other facts to

11

determine whether Dr. Swanger's testimony is reliable. First, this Court may consider whether Dr. Swanger is proposing to testify about matters growing naturally out of his research or whether he developed his theory solely for this litigation. *Daubert II*, 43 F.3d at 1317. Although Dr. Swanger has studied polymers, a material component of catheters, he admits to never having examined foley catheters or their design specifications before this litigation. Second, this Court may consider whether Dr. Swanger has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. *See General Electric*, 522 U.S. at 146. Here, Dr. Swanger performed a modified ASTM test that caused a failure in the main portion of the catheter when he filled it to 330 cc's-- a volume far greater than that which Dr. Russell utilized on Plaintiff's catheter. From this he extrapolated that Defendant's latex dipping process in a different portion of the catheter was defective. This is too far an analytical gap between the data and the opinion proffered to appear to be reliable. A final factor this Court may consider is whether the expert has accounted for obvious alternative explanations. *See Claar*, 29 F.3d at 502. At most, Dr. Swanger's test ruled out the possibility that Dr. Russell's overinflation of the catheter beyond the manufacturer's recommendations, caused the failure. By testing only one catheter, though, this Court is not persuaded that he ruled this theory out. Moreover, Dr. Swanger did not address the viability of other theories such as poor storage conditions and contaminated lubricants.

This Court's examination under the four *Daubert* factors and other significant factors reveals that Dr. Swanger's methodology is not scientifically reliable. Dr. Swanger's causation opinion is based on speculation, and the absence of scientific principles in his methodology deprives his opinion of the reliability necessary for admission in evidence. To be admissible, an expert's testimony must be based on "more than subjective belief or unsupported speculation." *Daubert*, 509

U.S. at 590. In accordance with *Daubert*'s gatekeeping function, this Court excludes Dr. Swanger's testimony as unreliable. As such, it need not reach the issue of whether Dr. Swanger's testimony assists the trier of fact.

### B. The Prima Facie Case for Strict Liability

To make a prima facie case for strict liability under Florida law and survive summary judgment, a plaintiff must prove: (1) the manufacturer's relationship to the product; (2) the defect; (3) the unreasonably dangerous condition of the product, and (4) the existence of a proximate causal connection between the condition and the user's injuries or damage. *See Clark v. Boeing Co.*, 395 So. 2d 1226, 1228 (Fla. 3d DCA 1981). The test is "whether or not the product was reasonably safe for its intended use as manufactured and  designed when it left the plant." *West v. Caterpillar Tractor Co.*, 336 So. 2d 80 (Fla. 1976).

Without Dr. Swanger's testimony, Plaintiff cannot prove the elements of a strict liability claim. Plaintiff has proffered the testimony of Dr. Keith Russell and Dr. Craig Herman. Neither of these witnesses, although experienced with the use of catheters, identified a particular defect in the foley catheter used on Plaintiff that led to Plaintiff's injuries. As such, there is insufficient evidence in the record to make a prima facie case.

Plaintiff attempts to circumvent his lack of evidence by arguing that the inference devised in *Cassisi v. Maytag Co.*, 396 So. 2d 1140 (Fla. 1st DCA 1981), applies. Florida courts apply the *Cassisi* inference when a product malfunctions during normal operation or use. *See Cassisi*, 396 So. 2d at 1148. The *Cassisi* court created an inference of liability in strict liability cases where the plaintiff's only proof is that the product malfunctioned during normal operation. *See Cassisi*, 396 So. 2d at 1146. This inference is commonly applied in cases where the product's malfunction eviscerates

13

its existence. *See Cassisi*, 396 So. 2d 1140, at 1150. In *Cassisi,* the court applied the inference when during normal operation a clothes dryer ignited and caused a house fire. The court distinguished products such as television sets, electric stoves, and clothes washers and dryers, which are activated by human agency but are otherwise self-operating from products that require more active human participation. *See id.*, 396 So. 2d at 1152. The court reasoned that the user's relationship with the latter type of product was passive and custodial in nature and therefore, the human activity was less likely to have caused the malfunction. *See id.* In that type of case, the court found the malfunction gave rise to an inference of liability. Cases involving products with more active human participation do not necessarily give rise to the same generous inference. *See id.*[3]

In this case, the foley catheter and its fragment are unavailable. Unlike the dryer in *Cassisi*, the catheter was not destroyed by the malfunction. It is missing because Baptist Hospital discarded it. Moreover, the evidence on the record indicates that the catheter is unlike the type of product for which the *Cassisi* court created the inference. This product requires application by trained medical personnel. The process of inflating and inserting the catheter involves more than just the mere push of a button. Dr. Russell testified that before inserting the catheter, he must determine what size catheter is appropriate and the volume to which it must be filled so that it does not fall out of the patient. This type of medical device requires human intervention and judgment that is far greater than that required to turn on a clothes dryer or a television set. Clearly, there is more room for

---

[3] The Eleventh Circuit stated that the *Cassisi* inference applies when a plaintiff can point to evidence that a cause of an accident most probably originated in a product. Evidence to establish this fact includes facts that negate alternative explanations. *See Worsham v. A.H. Robins*, 734 F.2d 676, 683 (11th Cir. 1984). Plaintiff's failure to rule out human negligence, inadequate storage, and contaminated lubricants weighs against a finding that the problem most probably originated within the product.

14

intervening factors and human negligence to cause damage.  As such, this Court finds that the

*Cassisi* inference does not apply and summary judgment is appropriately entered in favor of

Defendant C.R. Bard and Baxter Health Care Corp.[4]

## CONCLUSION

For the reasons stated above, it is

ADJUDGED that summary judgment is entered in favor of Defendants C.R. Bard and Baxter

Healthcare Corp.

DONE AND ORDERED in Chambers at Miami, Florida, this _30_ day of September, 2001.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

copies provided:

Jamie H. Zidell, Esq.
 300 71st Street
 Miami Beach, FL 33141

Kevin J. O'Grady, Esq.
 Ruden, McCloky, Smith, Schuster & Russell, P.A.
 200 E. Broward Blvd, 15th Fl.
 P.O. Box 1900
 Fort Lauderdale, FL 33302

---

[4]In its response to C.R. Bard's Motion for Summary Judgment, Baxter Healthcare Corp. moves for summary judgment arguing that it is vicariously liable only to the extent that there is a product defect. *See Julien P. Benjamin Equip. Corp. v. Blackwell Burner Co.*, 450 So. 2d 901, 902 (Fla, 3rd DCA 1984).  Because this Court finds that Plaintiff has failed to make a prima facie case for strict liability, summary judgment is entered in favor of both defendants.

Robert Chanderline Bauroth, Esq.
  Wicker, Smith, Tutan, O'Hara, McCoy, Graham & Ford, P.A.
  1 E. Broward Blvd.
  South Trust Tower, Suite 500
  P.O. Box 14460
  Fort Lauderdale, FL 33302

William W. Deem, Esq.
  McGuire, Woods, Battle & Boothe, LLP
  P.O. Box 4099
  Jacksonville, FL 32201-4099